**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re:

ENSEQUENCE, INC.,[1]

        Debtor.

Chapter 11

Case No. 18-_____ (___)

**DECLARATION OF MICHAEL WYSE IN SUPPORT
OF PETITION AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, Michael Wyse, declares as follows under the penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") and interim Chief Executive Officer ("**Interim CEO**") of Ensequence, Inc. (the "**Debtor**"), a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York. I have served as the CRO since November 12, 2017 and Interim CEO since January 2, 2018. Since that time, I have overseen the Debtor's business, including all financial functions, while leading the efforts to explore strategic alternatives for the Debtor.

2.      I am also the managing partner of Wyse Advisors, LLC, a financial advisory firm with a primary focus on stressed, distressed, and special situations, focusing on companies of various financial sizes and industries.

3.      I submit this declaration (the "**Declaration**") in support of the Debtor's chapter 11 bankruptcy petition and accompanying "first day" motions and applications, described in further detail below (collectively, the "**First Day Pleadings**"). I am over 18 years of age and competent to make this Declaration and testify to the facts set forth herein.

4.      I am generally familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records. Over the past several weeks, I have reviewed the

---

[1] The Debtor's last four digits of its U.S. federal tax identification number are 6904. The address for the Debtor's headquarters is 420 Lexington Ave., Suite 408, New York, NY 10170.

financial statements, observed management in their daily business, and discussed the business with employees, Debtor's counsel and its board of directors. Except as otherwise indicated, all facts as set forth in the Declaration as based upon my personal knowledge, my discussions with current and former employees and other members of the Debtor's management team, senior personnel, and advisors, my review of relevant documents and information concerning the Debtor's operations and financial affairs, as well as the Debtor's books and records, or my opinions based upon my experience and knowledge. If called as a witness to testify in this matter, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this declaration on behalf of the Debtor.

5.      On January 30, 2018 (the "**Petition Date**"), the Debtor filed a voluntary petition (the "**Petition**") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101-1532 (the "**Bankruptcy Code**") commencing the above-captioned bankruptcy case (the "**Chapter 11 Case**"). It is anticipated that the Debtor will continue to manage its affairs and operate its business as debtor and debtor-in-possession pursuant and subject to the requirements of Bankruptcy Code sections 1107(a) and 1108.

6.      I am familiar with the contents of each of the First Day Pleadings (including exhibits to such pleadings) and believe relief sought in each First Day Pleading will allow for an orderly transition of the Debtor into this Case and permit the Debtor to achieve its bankruptcy objectives as further described below.

## BACKGROUND

### History of the Debtor

7.      The Debtor is in the business of making advertisements on television more interactive and measurable. The Debtor was formed in 2001 as a provider of tools for building

2

interactive television applications for television networks, advertisers and distributors of network television. In 2009, Peter Low was named the Chief Executive Officer of the Debtor. Following his hire, the Debtor began to secure numerous major network contracts relative to interactive television or cable. In 2013, David Kline was hired as the Chief Operating Officer of the Debtor. During the period from 2013 to the present, the Debtor expanded its focus to include manufacturers of "smart televisions." Throughout its history, the Debtor has partnered with national cable networks (*e.g.*, MTV, NBC, ESPN, CNN, HBO, etc.), traditional distributors (*e.g.*, Comcast, Time Warner Cable, DIRECTV, etc.), and television manufacturers (*e.g.*, Samsung, LG, Sony, etc.).

8.      The Debtor previously engineered an "on-the-television" purchasing system for the shopping channel QVC UK. This system allowed consumers with QVC accounts to purchase items from the QVC catalog using only their remote control. Consumers could scroll through the catalog or featured items, and could purchase any of these items including what was currently being displayed in the television video feed. The ability of consumers to use only their remote control reduced call volume and costs for the QVC call center.

**Debtor's Business Operations**

9.      The Debtor's business operations consist of working with advertising companies and programmers in the development of interactive advertisements on different platforms. The Debtor's strategic platform is device-independent, thus, is able to work on over-the-top devices ("**OTT**"). The Debtor is positioned to provide interactive advertisements wherever video content is consumed.

10.     One of the Debtor's most vital products is ADCONNEQT+. This product allows advertisers to create more effective and accountable advertisements, allows cable networks to

recognize increase revenue from more effective and better positioned advertisements, and allows smart television manufacturers to monetize their products in a way they previously could not. It provides methods to encourage consumers to download the advertisers' mobile apps, to highlight current events (*e.g.*, a golf tournament), to receive coupons or other offers via text message, etc. It also encourages advertisers to think of television advertisements as more dynamic, thus allowing the usage of expensive video creative for longer periods of time without the effect becoming stale. These results are achieved by providing more detailed metrics for the parties, allowing for greater targeting for consumers. This leads to a consumer base more engaged by advertising content produced by the Debtor's strategic partners. The Debtor currently has an agreement with Quotient Technologies which enables the Debtor to make coupons accessible to consumers via television commercials. The Debtor views ADCONNEQT+ as part of it future strategy. Early testing and proof of concept campaigns have been performed with leading brands from major advertisement categories (*e.g.*, automotive and consumer package goods).

11.     The Debtor's other vital product is PROMOTIONS+. This product enables consumers to create reminders for their favorite shows. These reminders may be sent to the consumer's televisions or their smartphones. The reminders can be configured to arrive at specific times prior to the airing of the show, and can support series reminders where each time an episode airs, the consumer will get a reminder. The result is increased ratings for cable networks, with detailed reporting on the consumers.

12.     The Debtor has a significant portfolio of patented technology, as well as plans for additional patent protection, which includes extensions of existing patents, along with new patents to protect the Debtor's revenue stream going forward.

13.     In addition to its patent portfolio, the Debtor has more than 70 contracts with major networks which provide avenues to future growth through its existing and future product offerings. Therefore, the Debtor is positioned to work with advertisers and networks to ensure a better and more targeted experience for consumers.

14.     One year ago, the Debtor had approximately 50 employees, but as of the Petition Date, the Debtor has five full-time employees executing its strategic plan.

**Organizational Structure, Governance, and Current Management**

15.     The Debtor is a privately owned Delaware corporation.

16.     The Debtor's board of directors is comprised of two independent directors: Timothy Hughes and Michael Sullivan

**Capital Structure**

Secured Debt

17.     The Debtor's principal secured creditor is Myrian Capital Fund LLC (Series C) (the "**Prepetition Secured Lender**"). On October 11, 2010, the Debtor entered into a Senior Secured Promissory Note and Intellectual Property Security Agreement (together, the "**Prepetition Loan Documents**") with CYMI Technologies, Inc. These documents were later amended and assigned to the Prepetition Secured Lender. As of the Petition Date, the amount of principal and interest outstanding pursuant to the Prepetition Loan Documents is approximately $36.7 million (the "**Prepetition Secured Obligations**"). The Debtor is in default of the Prepetition Loan Documents and has entered into a forbearance agreement dated November 29, 2017 (the "**Forbearance Agreement**"). The Prepetition Secured Obligations are secured by all assets of the Debtor (the "**Prepetition Liens**").

5

18.     Upon information and belief, the only other secured debt relates to certain equipment lessors for office equipment.

Trade Payables

19.     Historically, the Debtor remained relatively current with its trade creditors. As of the Petition date, the Debtor owes approximately $170,000.00.

Litigation

20.     The Debtor is a defendant in a lawsuit brought by its former landlord. The matter is styled Rode, LLC v. Ensequence, Inc., Case No. 17-CV-4473 (Multnomah County Circuit Court). Upon information and belief, the plaintiff in the aforementioned action is seeking damages of approximately $1.0 million.

Equity Interests

21.     Although privately held, the Debtor has over 500 shareholders that invested approximately $130 million across six different series of capital raises. Upon information and belief, the only shareholders with over 5% in voting interest are entities related to the Prepetition Secured Creditor on account of their prior investors.

**Circumstances Leading to Chapter 11 Filing**

22.     One of the Debtor's key partners unexpectedly terminated its contract in late 2017 in favor of a different approach to its advertisements. This event resulted in a sharp decrease in revenue projections and profitability. Thus, the Debtor was no longer able to generate sufficient revenue to support its operations. Following the cancellation, the Prepetition Secured Lender issued a notice of non-payment of the Debtor's prepetition obligations. This notice required the Debtor to pay off its entire balance of approximately $36.7 million to the Prepetition Secured Lender within five (5) days. The Debtor was unable to satisfy this obligation but the Prepetition

Secured Lender agreed to enter the Forbearance Agreement in exchange for certain actions, including my appointment and hiring counsel to assist in ascertaining its strategic options.

23.     Pursuant to the Forbearance Agreement, the Debtor and Prepetition Secured Lender agreed upon terms for the continued use of the Prepetition Secured Lender's collateral. The Forbearance Agreement expires on January 31, 2018.

24.     The Debtor's intention in the Chapter Case 11 is to continue its operations while running an efficient and fruitful sales process for the benefit of its estate, creditors, and other stakeholders. The Debtor plans to achieve this purpose through the aggressive pursuit of strategic and non-strategic bidders.

## FIRST DAY PLEADINGS

25.     The Debtor filed the First Day Pleadings contemporaneously herewith to ensure that the Debtor's business continues to function during this Chapter 11 Case. For the reasons set forth below, the relief requested in the First Day Pleadings is necessary to (a) stabilize the Debtor's business operations, (b) operate with minimal disruption during the pendency of the Chapter 11 Case, (c) maintain value as a going concern, and (d) facilitate the efficient and economical administration of this Chapter 11 Case. A description of the relief requested and the facts supporting each of the First Day Declarations is set forth below.[2]

### Cash Management Motion

26.     Through the Motion of Debtor for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 345, 363, and 364, Fed. R. Bankr. P. 6003, and Del. Bankr. L.R. 2014-2 and 4001-3(I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Authorizing Continuation of

---

[2]  Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Pleading.

Existing Deposit Practices (the "**Cash Management Motion**"), the Debtor seeks orders: (i) authorizing, but not directing, the Debtor to continue to maintain and use its existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (ii) granting the Debtor a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtor's practices under its existing cash management system or other actions described in the Motion or this Interim Order; and (iii) authorizing, but not directing, the Debtor to continue to maintain and use its existing deposit practices.

Cash Management System and Bank Accounts

27.     In the ordinary course of its business, the Debtor maintains a cash management system (the "**Cash Management System**") that is integral to the operation and administration of its business. The Cash Management System allows the Debtor to (a) monitor and control all of the Debtor's cash receipts and disbursements, (b) identify the cash requirements of the Debtor, and (c) transfer cash as needed to respond to the cash requirements of the Debtor.

28.     The Cash Management System is managed by the Debtor at its headquarters in New York, NY, where it oversees the administration of the various bank accounts to effectuate the collection, disbursement, and movement of cash. Its oversight facilitates accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the Bank Accounts (as defined below).

29.     As of the Petition Date, the Debtor maintains three bank accounts (collectively, the "**Bank Accounts**") at Silicon Valley Bank ("**SVB**") in the United States.

30.     A schedule of the Bank Accounts is annexed to the Cash Management Motion as Schedule 1. As reflected in Schedule 1, each of the Bank Accounts is held in the name of the Debtor.

31.     The Bank Accounts and the Cash Management System are relatively simple. All receipts are deposited in the operating account, which is the same account that makes operating disbursements. Funds are transferred from the operating account into a "zero balance account" to fund payroll expenses. The only remaining account is the sweep account, which is not currently used by the Debtor.

32.     The operating account and the zero balance account are subject to a Deposit Account Control Agreement, dated October 6, 2010, for the benefit of Myrian Capital Fund, LLC (Series C) (the "**Prepetition Secured Creditor**").

Continued Use of the Debtor's Cash Management System and Bank Accounts

33.     I believe that the Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtor's business operations during the Chapter 11 Case and its goal of maximizing value for the benefit of all parties in interest. I believe that to require the Debtor to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burden, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtor's ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtor to address its cash management requirements, and the Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**"). Accordingly, the Debtor

requests that it be allowed to maintain and continue to use the Cash Management System, including maintenance of its existing Bank Accounts.

34.    As part of the relief requested herein, and to ensure that its transition into chapter 11 is as smooth as possible, the Debtor seeks an order authorizing the Debtor to: (a) maintain and continue to use the Bank Accounts, including but not limited to those accounts listed on Schedule 1 to the Cash Management Motion, in the same manner and with the same account numbers, styles, and document forms as are currently employed; (b) receive or deposit funds in and withdraw funds from the Bank Accounts in the ordinary course by all usual means, including checks, wire transfers, drafts, and electronic fund transfers or other items presented, issued, or drawn on the Bank Accounts; (c) pay ordinary course bank fees in connection with the Bank Accounts, including prepetition fees; (d) perform its obligations under the documents and agreements governing the Bank Accounts; and (e) for all purposes, treat the Bank Accounts as accounts of the Debtor in its capacity as a debtor in possession.

35.    If the relief requested herein is granted, the Debtor will work to implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtor prior to the Petition Date, other than those authorized by this Court.[3] To prevent the possible inadvertent payment of prepetition claims against the Debtor, except those otherwise authorized by the Court, the Debtor will work closely with SVB to ensure appropriate procedures are in place to prevent checks issued by the Debtor prepetition from being honored absent this Court's approval, and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtor's prepetition obligations.

---

[3] The Debtor has sought authority to pay certain of their prepetition obligations in various motions filed contemporaneously herewith

61844268.7

36.     To the extent that SVB honors a prepetition check or other item drawn on the Bank Accounts (a) at the direction of the Debtor to honor such prepetition check or item, or (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, the Debtor requests that SVB not be held liable to the Debtor or to its estate on account of such prepetition check or other item being honored postpetition. The Debtor believes that such flexibility is necessary to induce SVB to continue providing cash management services to the Debtor.

37.     Additionally, within fifteen (15) days of the date of entry of an interim or final order granting the Cash Management Motion, the Debtor will (a) contact SVB, (b) provide SVB with the Debtor's employer identification number, and (c) identify the accounts held at SVB as held by a debtor-in-possession in a bankruptcy case.

38.     In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Case, the Debtor requests that SVB be authorized and directed to continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course, and, when requested by the Debtor in its sole discretion, to honor any and all checks, drafts, wires, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts on account of a claim against the Debtor arising on or after the Petition Date.

39.     The Debtor further requests that it be authorized to implement such reasonable changes to the Cash Management System as the Debtor may deem necessary or appropriate, including, without limitation, closing any of the Bank Accounts and opening any additional bank accounts following the Petition Date (the "**New Accounts**") wherever the Debtor deems that such accounts are needed or appropriate and whether or not the banks in which the accounts are

opened are designated approved depositories in the District of Delaware. Notwithstanding the foregoing, any New Accounts that the Debtor opens will be at banks that have executed a Uniform Depository Agreement with the U.S. Trustee, or at such banks that are willing to immediately execute such an agreement, and any New Account that the Debtor opens in the United States will be (a) with a bank that is organized under the laws of the United States of America or any state therein and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (b) designated a "Debtor-in-Possession" account by the relevant bank. The Debtor requests that the relief sought by this Motion extend to any New Accounts and that any order approving this Motion provide that the New Accounts are deemed to be Bank Accounts that are similarly subject to the rights, obligations, and relief granted in such order. The Debtor will provide the U.S. Trustee with prompt notice of any Bank Accounts that it closes or New Accounts that it opens. In furtherance of the foregoing, the Debtor also requests that the relevant banks be authorized to honor the Debtor's requests to open or close (as the case may be) such Debtor Bank Account(s) or New Account(s).

<u>Continued Use of Debtor's Existing Checking Accounts and Business Forms</u>

40.     To minimize expenses to its estate, the Debtor seeks authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's status as a debtor in possession; <u>provided</u>, <u>however</u>, that in the event the Debtor generates new checks during the pendency of the Chapter 11 Case other than from its existing stock of checks, such checks will include a legend referring to the Debtor as a "Debtor-in-Possession." The Debtor also seeks authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtor's status as a debtor in possession.

41.     I believe changing the Debtor's existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtor's estate. Further, such changes would disrupt the Debtor's business operations and would not confer any benefit upon parties that deal with the Debtor. For these reasons, the Debtor requests that it be authorized to use its existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

<u>Waiver of Certain Requirements of the U.S. Trustee</u>

42.     The Debtor further requests, pursuant to Bankruptcy Code sections 105(a) and 363, that this Court grant a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (a) the Debtor's existing practices under the Cash Management System, or (b) any action taken by the Debtor in accordance with any order granting this Motion or any other order entered in the Chapter 11 Case. To supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines for debtors in possession. These requirements (the "**UST Requirements**") require chapter 11 debtors to, among other things: (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; and (c) maintain a separate debtor in possession account for cash collateral.

43.     The Debtor seeks a waiver of the UST Requirements that it close the Bank Accounts and open new postpetition bank accounts. If enforced in this Chapter 11 Case, I believe such requirements would disrupt the Debtor's business, causing delays in payments to vendors, administrative creditors, employees, and others, thereby impeding the Debtor's efforts through the bankruptcy. As described above, I believe the Bank Accounts are central to the Debtor's

13

Cash Management System, which the Debtor needs to maintain smooth disbursements in the ordinary course of business. Disrupting the Cash Management System would serve no legitimate or rehabilitative purpose and would be destructive to the Debtor's value as a going concern.

44.    Further, I believe it would be unnecessary and inefficient to require the Debtor to abide by the UST Requirement to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtor's payroll and other tax obligations. The creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

45.    In addition, it is unnecessary to require the Debtor to abide by the UST Requirement to establish specific debtor-in-possession accounts for cash collateral. As set forth in the *Motion of Debtor for Interim and Final Order Pursuant to 11 U.S.C. §§105, 361, 362, 363, and 364 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "**Cash Collateral Motion**") filed concurrently herewith, the Debtor has provided significant safeguards to ensure that the party with security interests in the Debtor's cash collateral is adequately protected and that such party has been provided with notice of the proposed use of such cash collateral.

46.    As part of the Cash Management System, the Debtor may deposit funds into the Bank Accounts (the "**Deposit Practices**"). The Debtor requests (a) authorization to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtor may implement to the Cash Management System, and (b) a waiver of the deposit requirements of Bankruptcy Code section 345(b), on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices. For the avoidance

14

of doubt, the Debtor hereby seeks authorization to continue to deposit funds into the Bank Accounts in accordance with existing practices.

**Cash Collateral Motion**

47.    Along with its other First Day Pleadings, the Debtor has filed the Cash Collateral Motion.

48.    As of the Petition Date, there is approximately $36,700,000 in principal and interest outstanding (the "**Prepetition Debt**") under the Prepetition Loan Documents. The Prepetition Debt is validly secured with a first priority lien on substantially all of the Debtor's assets (the "**Prepetition Collateral**"), including all cash and cash equivalents of the Debtor or proceeds thereof (the "**Cash Collateral**"). Pursuant to the Prepetition Loan Documents, the Prepetition Debt matured on June 30, 2017.

49.    I believe if the Cash Collateral Motion is not approved and the Debtor does not obtain authorization to use the Cash Collateral, the Debtor will suffer immediate and irreparable harm. Without the use of the Cash Collateral, the Debtor will not have the liquidity to conduct its business as a going concern. The pledge of substantially all of Debtor's assets limits the Debtor's flexibility in raising additional capital. The Debtor urgently needs funds to make payroll and other operational expenditures that are critical to its continued viability and ability to conduct a sale of its assets as a going concern.

50.    I believe it to be vital to the success of the Debtor's sale efforts that it immediately obtains access to Cash Collateral. The preservation of the Debtor's business and the Debtor's ability to conduct a sale successfully depend heavily upon the expeditious approval of the use of Cash Collateral for general working capital purposes. Absent this Court's approval of

the interim relief sought herein, the Debtor faces a substantial risk of severe disruption to its business operations and irreparable damage to its relationships with its vendors.

51.    The Debtor's request for use of Cash Collateral is limited to budgeted expenses reasonably calculated to maximize the value of the Debtor's assets and the realization on the Prepetition Collateral.

52.    I believe the Debtor has an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, and seeks to use all Cash Collateral existing on or after the Petition Date. The Debtor needs the Cash Collateral to pay operating expenses all in accordance with the Budget. Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors.

53.    The Debtor has prepared a budget, a copy of which is attached to the Cash Collateral Motion as <u>Exhibit A</u> (the "**Budget**"), which shows, *inter alia*, the Debtor's forecasted disbursements from the Petition Date through March 30, 2018. Pursuant to the Budget, the Debtor intends to use Cash Collateral, among other things, (a) to pay (i) payroll expenses, (ii) postpetition trade amounts, and (iii) various prepetition claims paid in the ordinary course that are the subject of other motions filed concurrently herewith, as authorized by the Court; (b) as working capital; (c) to fund critical business operations conducted by the Debtor; and (id) for other general corporate purposes.

54.    Absent the entry of an Order permitting the Debtor to use Cash Collateral to pay disbursements under the Budget, the Debtor will have insufficient funds available to operate its businesses, administer the Chapter 11 Case, and sell its assets as a going concern.

55.    I believe that the terms and conditions of its use of the Cash Collateral (including the provision of adequate protection described herein) are appropriate and reasonable and that

such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Therefore, the Debtor submits that it should be authorized to use the Cash Collateral on the terms set forth in the Budget.

56.     I believe the reasons supporting the Debtor's need to use Cash Collateral during the course of the Debtor's case are compelling. All of the Debtor's assets are encumbered under the Prepetition Facility. Therefore, it would be impossible to operate the Debtor's businesses and conduct this Chapter 11 Case absent authorization to use the Cash Collateral. Unless this Court authorizes the use of the Cash Collateral, the Debtor's operations would likely cease, resulting in adverse effects on the value of the Debtor's estate to the severe detriment to all stakeholders. Particularly harmed would be the employees of the Debtor, whose employment would be terminated in the event the Debtor is unable to use the Cash Collateral.

57.     On the other hand, permitting the Debtor to use the Cash Collateral to fund this Chapter 11 Case for a short period of time to conduct an orderly sale process on a going concern basis would benefit all of the Debtor's stakeholders.

58.     The Debtor believes that the adequate protection proposed herein to protect any diminution in value of the Prepetition Lender's interest in the Prepetition Collateral is fair and reasonable. Importantly, the proposed adequate protection shall only be provided to the extent there is any diminution in value to the Prepetition Lender's interest in the Prepetition Collateral. Accordingly, based upon the foregoing, the Debtor respectfully requests that the Court authorize the Debtor to provide the adequate protection described above to such parties.

**Employee Wage Motion**

59.     Along with its other First Day Pleadings, the Debtor has filed a Motion for Entry of Interim and Final Orders (a) Authorizing Payment of Certain Prepetition Employee Claims,

Including Wages, Salaries, and Other Compensation, (b) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (c) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (d) Authorizing Payment of Withholding and Payroll-Related Taxes, (e) Authorizing Payment of Workers' Compensation Obligations, and (f) Authorizing Payment of Prepetition Claims owning to Administrators and Third-Party Providers (the motion, "**Employee Wage Motion**" and the aforementioned obligations, the "**Employee Obligations**").

60.     As of the Petition Date, the Debtor had five employees –all of whom are full-time (the "**Employees**"), three in New York and two in Portland.

61.     I believe that the Employees are vital for the Debtor's business, and their value cannot be overstated. To a significant extent, the Debtor's success depends upon its ability to attract and retain qualified personnel. The loss of certain Employees could impede the Debtor's short-term objectives and seriously harm its ability to successfully implement its business strategy. Furthermore, replacing Employees can be difficult for the Debtor given the limited number of individuals in its industry with the breadth of skills and experience required.

62.     Further, I believe the Debtor's ability to successfully operate is contingent on a reliable and loyal Workforce. As stated above, competition for qualified employees is intense in the Debtor's industry. Thus, it is essential to assure the Employees that the Debtor will honor the Employee Obligations and continue and maintain the Employee Plans and Programs in the ordinary course of business throughout this Chapter 11 Case. A failure to promptly do so will create concern and discontent among the Employees and could lead to resignations or, in the case of Consultants, the decision to not complete work for the Debtor or accept future hiring

proposals. The loss of even a few key personnel would immediately and irreparably harm the Debtor's ability to maintain operations to the detriment of all interested parties.

63.     I believe that if the Debtor is unable to satisfy such obligations, Employee morale and loyalty will suffer at a time when Employee support is critical. In the absence of such payments, I believe that the Debtor's Employees may seek alternative employment opportunities, perhaps with its competitors. Such a development would deplete the Workforce and likely diminish creditor and counterparty confidence in the Debtor. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtor must focus on sustaining its operations. Accordingly, I believe the Debtor must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to honor wages, benefits, and related obligations, including those that accrued prior to the Petition Date, as set forth in the Employee Wage Motion.

64.     Therefore, for the reasons set forth herein and expanded upon the Employee Wage Motion, on behalf of the Debtor, I respectfully submit that the relief requested is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in the Chapter 11 Case with minimal disruption, thereby maximizing the value of the estate.

**Administrative, Notice and Claims Agent Applications**

65.     Through two applications, the Debtor seeks authority to employ and retain Rust Consulting/Omni Bankruptcy ("**Rust Omni**") as the Debtor's claims and noticing agent during the Chapter 11 Case and as an administrative advisor. Rust Omni is a bankruptcy administrator specializing in claims management and legal administration services. Rust Omni provides

19

comprehensive chapter 11 services, including noticing, claims processing, balloting, and other related services critical to the effective administration of chapter 11 cases. Based on Rust Omni's experience, I believe that Rust Omni is well-qualified to serve as the Claims and Noticing Agent in this Chapter 11 Case. Additionally, I believe Rust Omni's rates are reasonable and competitive given the quality of service and expertise. By appointing Rust Omni as the Claims and Noticing Agent in this case, the distribution of notices and the processing of claims will be expedited, and the Clerk's office will be relieved of the administrative burden of processing such claims.

66.     Prior to selection of Rust Omni as administrative, claims, and noticing agent, the Debtor obtained and reviewed proposals from three (3) other claims and noticing agents to ensure selection through a competitive process. I believe, based on all engagement proposals obtained and reviewed, that Rust Omni's rates are competitive and reasonable given Rust Omni's quality of services and expertise.

67.     In view of the number of anticipated claimants and the complexity of the Debtor's business, I believe that the appointment of Rust Omni as claims and noticing agent is both necessary and in the best interests of the Debtor's estate and its creditors.

**Conclusion**

68.     The Debtor's goal for this Chapter 11 Case is to maximize the value of its estate through a sale process. To achieve that goal, I believe it is critical for the Debtor to maintain its business during the early stages of this Chapter 11 Case. If this Court were to grant the relief requested in the First Day Motions, the Debtor's ability to achieve that goal will be greatly increased.

61844268.7

69.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all relief requested in the First Day Motions be granted, together with such other further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 30, 2018                          */s/ Michael Wyse*
                                                 Michael Wyse
                                                 Chief Restructuring Officer